**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

May 10 2013, 8:26 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT (Mother):

**GREGG S. THEOBALD**
Lafayette, Indiana


ATTORNEY FOR APPELLANT (Father):

**HAROLD E. AMSTUTZ**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES:

**LUMINITA NODIT**
DCS Local Office in Tippecanoe County
Lafayette, Indiana


**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.T. and D.T., minor children, and C.T., biological father, and K.P., biological mother, <br><br> C.T. and K.P., <br><br>　　　Appellants-Respondents, <br><br>　　　　　　vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>　　　Appellee-Petitioner. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 79A02-1210-JT-837 |

---

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas K. Milligan, Senior Judge
Cause Nos. 79D03-1206-JT-74, -75, -76, & -77

---

**May 10, 2013**


**MEMORANDUM DECISION - NOT FOR PUBLICATION**


**KIRSCH, Judge**

C.T. ("Father") and K.P. ("Mother") appeal the involuntary termination of their parental rights to their children, C.T. and D.T. In so doing, Father and Mother challenge the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts supporting the termination of Father's and Mother's parental rights to their children, C.T., who was born on January 5, 2010, and D.T., who was born on February 23, 2011, reveal that on September 20, 2011, the Tippecanoe County Department of Child Services ("TCDCS") family case manager Casey Langston ("FCM Langston") received a report of domestic violence between Father and Mother and that Mother wished for TCDCS to take custody of C.T. and D.T. Mother indicated that she did not want the children to remain in her care. FCM Langston assessed the report and made the following findings:

1) Mother wanted TCDCS to care for C.T. and D.T.;
2) Mother and Father were not getting along including Father acting violently toward Mother including the use of physical violence;
3) Mother and Father had a history of domestic violence prior to the assessment, including an incident during the assessment, which concluded without an arrest;
4) Mother and Father had issues with instability;
5) Mother and Father were being evicted from their home;
6) Mother was missing work and was at risk of losing her job;
7) Mother failed to submit to a drug screen by offering excuses for missing scheduled tests;
8) Father tested positive for marijuana and admitted to the use of marijuana;
9) Both C.T., who was one year old, and D.T., who was seven months old, at the time of the test, tested positive for cocaine and C.T. also tested positive for marijuana;
10) Mother and Father had no explanation for C.T.'s and D.T.'s positive drug screen results; and

2

11) Mother and Father stated that they were the sole caregivers for C.T. and D.T.

*A/V Recording 9/19/2012* at 8:46:25-8:49:30.[1]  C.T. and D.T. remained in Mother's and Father's home during the assessment period.

C.T. and D.T. were removed from Mother's and Father's home on October 17, 2011, and on October 18, 2011, the juvenile court authorized TCDCS to file a petition alleging that C.T. and D.T. were children in need of services ("CHINS").  TCDCS filed the CHINS petition that same day, alleging that Mother admitted she was unable to care for the children due to issues of domestic violence, homelessness, and instability.  The juvenile court conducted a detention and initial hearing, during which Mother and Father admitted the material allegations in the CHINS petition.  The juvenile court approved the removal and the children were placed in foster care for ten days before they were transferred to a kinship placement.

On October 26, 2011, the juvenile court held a dispositional hearing, and later entered its order granting wardship of C.T. and D.T. to TCDCS, placing the children in foster care, and ordering Mother and Father to participate in various services.  On November 4, 2011, the juvenile court entered its amended initial hearing order adjudicating C.T. and D.T. as CHINS.  In particular, the juvenile court found as follows:

1) both Mother and Father had issues with instability;

---

[1] This appeal comes from a matter tried in Tippecanoe Superior Court #3, a trial court participating in the *Indiana Court Reporting Pilot Project for Audio/Visual Recordings*.  *See In Re Pilot Project For Audio/Visual Recordings In Lieu of Paper Transcripts In the Preparation of the Record and Briefing on Appeal*, Case No. 94S00-1209-MS-522 (Ind. September 18, 2012).  Because there is no paper transcript, our citations reflect the location of the information on the DVD.  We wish to thank the trial court for its participation in this effort.

2)  Mother and Father were being evicted from their home;
3)  Mother and Father owe in excess of $1,800.00[2] in back rent and court costs;
4)  Mother and Father were not employed;
5)  There were ongoing concerns about domestic violence and drug use;
6)  Father tested positive for marijuana;
7)  Mother did not submit to a drug screen;
8)  Both children tested positive for drugs, with C.T. testing positive for cocaine and marijuana and D.T. testing positive for cocaine; and
9)  Mother and Father failed to explain the positive drug screens for C.T. and D.T.

*TCDCS Ex*. 1 at 16.  The dispositional hearing held on October 25, 2011 resulted in the juvenile court's entry of an order directing the parents to do the following:

1)  Maintain contact with TCDCS and notify TCDCS of any changes in address, household members, telephone number, or employment;
2)  Participate in visitation per an agreement reached with the treatment team;
3)  Remain drug and alcohol free and submit to random drug screens;
4)  Refrain from using prescription medications that are not prescribed;
5)  Participate in a parenting assessment and follow all the recommendations including learning about the importance of eliminating domestic violence to effectively and positively parent the children;
6)  Participate in and complete a domestic violence assessment, and follow the recommendations;
7)  Participate in home-based care management;
8)  Obtain housing and employment; and
9)  Sign releases as requested.

*Id*. at 16-19.  In addition, Mother was ordered to 1) participate in and complete a mental health assessment to obtain an updated diagnosis, and to follow the recommendations, and 2) participate in and complete a substance abuse assessment and follow the recommendation if her screens were positive for illegal substances or prescription medication not prescribed to

---

[2] The pre-dispositional report lists the amount of debt as $1,875.00.  *DCS Ex*. 21.  The chronological case summary states that the debt is in the amount of $1,975.00.  *DCS Ex*. 1 at 16.

4

her. *Id*. Father was further ordered to participate in and complete a substance abuse assessment and follow the recommendation. *Id*.

Ultimately, on June 25, 2012, the juvenile court approved a permanency plan of adoption and termination of parental rights. The TCDCS filed its petition to terminate Mother's and Father's parental rights to C.T. and D.T. After the initial hearing on the petition, the juvenile court appointed counsel to represent Mother and Father. An evidentiary hearing was held on the petition on September 19, 2012, after which the juvenile court took the matter under advisement. The juvenile court entered its order terminating Mother's and Father's parental rights on September 24, 2012. Both Mother and Father appeal from that order, and their separate appeals were consolidated for our review.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

5

Here, in terminating Mother's and Father's parental rights, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

　　(i)     There is a reasonable probability that the conditions that
　　　　　 resulted in the child's removal or the reasons for placement

6

outside the home of the parents will not be remedied.

     (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

     (iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;

    (C)     that termination is in the best interests of the child; and

    (D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis supplied). Father and Mother challenge the sufficiency of the evidence supporting the juvenile court's order.

At the outset, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See e.g. L.S.*, 717 N.E.2d at 209. Although we need only address one of the three requirements, we will address the first two—the requirements that are challenged

7

by Father and Mother.[3]

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services, here, TCDCS, and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, the TCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *See In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In particular, Mother and Father challenge the juvenile court's legal conclusions that 1) there is a reasonable probability that the conditions that resulted in C.T. and D.T.'s removal will not be remedied, 2) there is a reasonable probability that continuation of the parent-child relationship poses a threat to C.T.'s and D.T.'s wellbeing, 3) termination is in

---

[3] None of the parties allege that C.T. and D.T. were adjudicated CHINS on two separate occasions, nor does the trial court's order reflect such a finding. Therefore, we limit our analysis and review to Ind. Code § 31-35-2-4(b)(2)(B)(i) & (ii), and not (iii).

the best interest of the children, and 4) TCDCS has a satisfactory plan for the care and treatment of C.T. and D.T.

With respect to the juvenile court's factual findings, Mother challenges three in particular. She first challenges the juvenile court's finding with regard to domestic violence treatment, which reads as follows:

> With regard to the domestic violence issues, [Mother] was referred to group and referred to weekly therapy; she never attended any domestic violence group and as mentioned above has not dealt appropriately in any sort of therapy or treatment for domestic violence issues.

*Mother's App.* at 10-11. Mother cites to her attendance, with Father, at faith-based counseling through two different churches. Mother argues that this counseling has helped her to control her anger and become a more patient person.

Mother also challenges the juvenile court's finding with regard to her preparedness for visitation with the children, which reads in part as follows:

> . . . . [Mother] did not provide for the children things that were expected of her to provide during visits, such as diapers and wipes, food, bottles, cups for the children to use; however, she was able to afford cigarettes to support her smoking habits, . . . .

*Id*. at 11. In particular, Mother points to evidence that she did provide those items for her children at times. We note, however, that the juvenile court's order goes on to state that Mother "could not reliably provide those things for the children." *Id*.

She further challenges the finding with regard to her own progress, which reads as follows:

> . . . . It's apparent that [Mother] slid back into the old ways in [which] they had been living before [Father] went to jail.

9

*Id.* at 10. Mother supports her contention with citations to contrary evidence in the record.

Father does not point to any specific factual finding he claims is untrue or not supported by the record. Instead he argues that the findings are "inaccurate, incomplete and misleading." *Father's Br.* at 8. Father's challenges can be summarized as follows:

> 1) TCDCS testimony and the juvenile court's findings note Father's criminal history, but Father has resolved his criminal cases, and no petitions to revoke his probation had been filed as of the time of the termination hearing;
>
> 2) TCDCS testimony and the juvenile court's findings refer to Father's prior conviction for domestic violence against Mother, but there had been no incidents of domestic violence since December 2011; and
>
> 3) TCDCS testimony and the juvenile court's findings note that Father was incarcerated form December 2011 until June 2012, but no services were available to Father. Several cases have overturned appeals in which incarcerated parents were involved.

We reiterate that while a parent's fitness to care for a child must be judged at the time of the termination hearing and take into consideration evidence of changed conditions, the parent's habitual patterns of conduct must also be evaluated in order to determine the probability of future neglect or deprivation of the child. *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004). "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe Cnty Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "Moreover, a trial court 'can reasonably consider the services offered by the [OFC] to the parent and the parent's response to those services.'" *Id.* Thus, to the extent Mother and Father are arguing that the trial court

erred by considering the evidence supporting those findings, they are incorrect. To the extent they are arguing that there is evidence to the contrary in the record, their argument along those lines is an invitation for us to reweigh the evidence, a task we are forbidden from undertaking on review. *In re D.D.*, 804 N.E.2d at 265.

The unchallenged factual findings establish that C.T. and D.T. were originally removed from Mother and Father's home because of domestic violence between Mother and Father, Mother did not believe she could care for the children and wanted TCDCS to take the children, the family was facing eviction from their home, there were substance abuse issues, as well as issues with employment. C.T. and D.T. tested positive for illegal drugs and Mother and Father could not explain the children's positive drug screens. Father's criminal history consisted of two prior convictions for domestic battery, in addition to convictions for theft, auto theft, and burglary. Mother's criminal history included convictions for check deception, operating without a driver's license, forgery, auto theft, public intoxication, and domestic battery. Mother and Father, who are not married, both had prior involvement with the TCDCS. Including C.T. and D.T., Mother has six children and none were in her custody as of the date of the termination hearing. None of Father's eight children, including C.T. and D.T., were in his custody as of the date of the termination hearing. CHINS actions were filed regarding some of Mother's and some of Father's other children.

Mother had been employed for approximately three months at the time of the termination hearing, but her efforts to improve her employment and housing situation appeared to coincide with the TCDCS's change in plan from reunification with the children,

to termination of parental rights.  Throughout the pendency of the CHINS proceedings, the evidence established that Mother lied about her substance abuse issues, she erratically participated in some services, relapsed and then dropped out, never resuming those same services.  During visitation it was apparent that Mother loved her children, but that she did not engage with the children during those visits, which were reduced from six or eight hours per week, to one hour per week.  Mother continued to have difficulty securing stable housing, moving seven times in one year, and none of those housing prospects were suitable for children.

With respect to Father, he blamed Mother and TCDCS for some of his problems including missed visits.  Father notes that he was incarcerated for incidents of domestic violence against Mother and argues that his situation should be likened to several cases where the termination of the parental rights of a parent who was incarcerated during the pendency of the proceedings was reversed.  *See e.g.*, *In re Ma.J.*, 972 N.E.2d 394, 404 (Ind. Ct. App. 2012) (termination reversed where trial court determination focused on fitness of parent prior to incarceration, not at time of termination hearing, which showed progress in areas of concern); *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006) (termination reversed where incarcerated parent made progress in areas of concern while incarcerated and termination occurred prior to his release).  The record reveals, however, that Father's situation is distinguishable from the above cases and others cited.  Witnesses testified that Father lacked progress and motivation to reunite with his children and failed to comply with court orders and services.  The juvenile court

acknowledged Father's ability to secure housing and employment, but also noted that he had not addressed the main issue of domestic violence.

Some effort was made by Mother and Father to remedy the conditions that ultimately led to the removal of C.T. and D.T. from their care, and they should be encouraged to continue to make those efforts to better themselves. Those recent changes, in contrast to each parent's habitual patterns of conduct, however, do not convince us that the trial court's decision to terminate their parental rights to C.T. and D.T. was clearly erroneous. "[T]he time for parents to rehabilitate themselves is during the CHINS process, *prior* to the filing of the petition for termination. The termination statutes do not require the court to give a parent additional time to meet his or her obligations under the Parent Participation Plan." *Prince v. Dep't of Child Services*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) (emphasis in original). Therefore, consistent with our standard of review, we decline the invitation to reweigh the evidence and must affirm the trial court's judgment on this ground.

With respect to the finding that there is a reasonable probability that continuation of the parent-child relationship poses a threat to C.T.'s and D.T.'s wellbeing, we conclude that the trial court's decision is not clearly erroneous. Mother testified at the termination hearing that she was afraid of Father. Six weeks prior to the termination hearing, she admitted she had stated that if she did not leave Father, she would end up dead. Father admitted that domestic violence was an issue in his relationship with Mother and that he does not blame Mother for fearing him. Mother testified at the hearing that she did not think she and Father

13

should be together at that time, and Father agreed at the hearing that their relationship was not where it needed to be.

Mother testified about her struggle with mental health issues and admitted to lying and being manipulative during the CHINS case. Mother was referred to individual therapy and couple counseling, but failed to consistently attend. Father was uncooperative with services providers. At the termination hearing, Mother requested that the matter be continued so that she could make additional efforts to be reunited with her children and admitted that she was not ready to have C.T. and D.T. in her care at that time. The juvenile court's ruling in this regard is not clearly erroneous.

Mother's and Father's arguments in regard to the juvenile court's finding that termination of their parental rights to the children was in the best interest of the children and their challenges to the sufficiency of the evidence that TCDCS had a satisfactory plan for the children dovetail. As such, we will address them in combination.

Both parents argue that termination of their rights to the children is not in the best interest of C.T. and D.T. because the children would likely be adopted separately and that their interests would be better served by continued efforts toward reunification. When considering the best interests of the child or children a juvenile court must subordinate a parent's interests to those of the child. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The juvenile court is required to look beyond those factors identified by the local department of child services and to consider the totality of the evidence. *Id.* Furthermore, the recommendations of the case manager and court-appointed special advocate to terminate

14

parental rights, in addition to evidence that the conditions leading to the removal of the children from the home will not be remedied, is sufficient to show by clear and convincing evidence that termination of parental rights is in the child's, or in this case, the children's, best interests. *Id.*

Here, both the case manager and the court-appointed special advocate recommended termination of Mother's and Father's parental rights to C.T. and D.T. Witnesses testified that C.T. and D.T. were bonded with their foster parents and were doing well in their care. Both children had progressed developmentally. As previously discussed, there was sufficient evidence to establish that the conditions leading up to the children's removal would not be remedied. The trial court's decision to terminate Mother's and Father's parental rights is supported by sufficient evidence, which clearly and convincingly establishes that the decision is in the children's best interests.

Mother's and Father's argument challenging the sufficiency of the evidence that TCDCS had a satisfactory plan for the care and treatment of the children concentrates on C.T.'s and D.T.'s placement after the termination of Mother's and Father's parental rights. The plan called for the placement family's adult daughters to each adopt one of the children. Those adult daughters lived together at the time of the termination hearing. Mother and Father contend that in the future, the prospective adoptive parents might relocate or obtain separate residences, thus separating C.T. and D.T. Mother and Father argue that there is no compelling reason why C.T. and D.T. could not be adopted by the same family.

"[I]n order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child." *In re B.D.J.*, 728 N.E.2d 195, 204 (Ind. Ct. App. 2000). The plan need not be detailed, but should offer a "general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Id.* We have held that even where there is no specific family identified as prospective adoptive parents, the plan for adoptive placement can be satisfactory. *Id.* "Attempting to find suitable parents to adopt the children is clearly a satisfactory plan." *Lang v. Starke Cnty Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007).

C.T. and D.T. were placed with the same foster family where Mother had been placed in her youth. In that placement, C.T. and D.T. had contact with another one of Mother's children. Two adult daughters, who were members of the foster family, and who were living together and working toward licensing as foster parents, each wished to adopt one of the children. This evidence is sufficient to show that TCDCS had a satisfactory plan for the care and treatment of C.T. and D.T.

Mother and Father appear to urge this court to require the local offices of the department of child services to present evidence pertaining to, or at least to address, data supplied by independent studies of the long-term effect of the termination of parental rights on the children. *See Mother's Br.* at 20-21; *Father's Br.* at 13. They contend that this objective evidence is necessary in the context of these cases. We previously have stated the following:

> The best interests of the child is not relevant to the fitness of the parent to raise the child. While the ability of the parent to raise the child is an objective measure of the parent[']s ability to provide a safe environment and nurture the child, the child's best interest is a subjective measure of what would most benefit the child in these particular circumstances, and thus both must be established on the basis of individualized proof.

*In re B.D.J.*, 728 N.E.2d at 203 n.3 (citations omitted). We decline the invitation to establish this requirement noting that the necessity of individualized proof in the determination whether termination of parental rights is appropriate.

We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's and Father's parental rights to C.T. and D.T. was clearly erroneous. We therefore affirm the juvenile court's judgment.

Affirmed.

MAY, J., and BRADFORD, J., concur.