# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DAVID M. PAYNE**
Ryan & Payne
Marion, Indiana

ATTORNEYS FOR APPELLEE:

**DEBORAH S. BURKE**
DCS Grant County Office
Marion, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Aug 13 2012, 9:34 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION )
OF THE PARENT-CHILD RELATIONSHIP OF )
Ma.J. AND My.J., (MINOR CHILDREN), and )
)
K.B. (MOTHER), )
)
    Appellant-Respondent, )
)
        vs. )    No. 27A02-1112-JT-1193
)
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Dana J. Kenworthy, Judge Pro Tempore
Cause No. 27D02-1103-JT-205

**August 13, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

In this case, the trial court terminated the parent-child relationship of twin girls, Ma.J. and My.J., and their parents, K.B. ("Mother") and S.J. ("Father").[1] The Department of Child Services ("DCS") initially became involved following Mother and Father's arrest in relation to a domestic dispute. Mother and Father each admitted that the twins were children in need of services ("CHINS") based on their history of domestic violence, which had sometimes occurred in the presence of the children. Mother initially engaged in services and was making progress, but after beginning a relationship with a new boyfriend, she began a downward spiral that culminated in her incarceration for about two months.

After her release, Mother admitted that she had been crushing and snorting her prescription medications, and she was accepted into a drug court program. Since then, Mother has stopped taking prescription medications and has been in compliance with the drug court program. Mother will serve no additional time if she successfully completes the program. Mother has not been involved in any new incidents of domestic violence, and she has not been in a relationship since her release. Mother has an appropriate home, has been working, and has been visiting regularly with the girls.

However, the trial court terminated Mother's parental rights, finding that the conditions that resulted in the children's removal would not be remedied. In light of the undisputed evidence that Mother had eight months of solid progress in each area of concern,

---

[1] Father was incarcerated throughout most of the CHINS and termination proceedings. He does not participate in this appeal, and the facts of his case will be mentioned only to the extent that they are relevant to Mother's case.

2

we conclude that DCS did not meet its burden of demonstrating that the conditions resulting in removal would not be remedied. Therefore, we reverse.

**Facts and Procedural History**

Mother and Father are the parents of twin girls, Ma.J. and My.J., born May 25, 2007. Mother and Father are not married, but Father's paternity of the twins has been established, and as of September 10, 2009, Mother and Father were living together. On that date, police responded to a domestic dispute involving Mother and Father, and both of the parents were arrested. The twins were briefly left in the care of a neighbor until they were placed with Mother's half-sister and her husband, and the girls have remained in their care throughout the pendency of this case.

On September 15, 2009, DCS filed petitions alleging that the twins were CHINS. Mother's oldest child, C.S., who is Ma.J. and My.J.'s half-sister, had also been living with Mother and Father. DCS also filed a CHINS petition in regard to C.S., but that case was resolved when C.S.'s father obtained custody of her. In addition to the facts surrounding the twins' removal, the petitions noted that Father had previously been convicted of battering Mother in the twins' presence. Based on statements made by C.S., DCS also alleged that Mother and Father were abusing prescription drugs.

On October 15, 2009, Mother and Father admitted some of the allegations of the CHINS petitions. Specifically, Mother admitted that "there is a history of domestic violence in the home she share[s] with [Father] and that some disputes have occurred in the presence

of her children." Ex. Vol. at 21.[2]  Father also admitted that there was a history of domestic violence.  The trial court found the girls to be CHINS based solely on these admissions.

On November 4, 2009, Mother was charged with theft and conspiracy to commit theft, and Father was a co-defendant in that case.  The following day, the trial court held a dispositional hearing in the CHINS cases and entered participation orders for Mother and Father.  Specifically, Mother was ordered to:  participate in counseling and follow any and all recommendations of her therapist; follow the visitation schedule for all three of her children; maintain regular contact with her DCS case manager, Cayce Lowe; continue with home-based case management and follow any and all recommendations; take her medications as prescribed; maintain a safe and stable home for the children; and complete an assessment for drugs and alcohol and follow any and all recommendations for needed services.

On January 25, 2010, Mother began meeting with a therapist, Jeanette Hoeksema. Hoeksema felt that mother had "an excellent start to counseling."  Tr. at 66.  Mother mentioned being in a relationship with a man named Stacy Hollars.  After breaking up with Hollars, Mother "referred to him as controlling."  *Id*. at 58.  Hoeksema felt it was a positive sign that Mother was able to identify problems with the relationship.

As of March 2010, DCS felt that Mother was making good progress, and DCS was working toward reunifying Mother and the twins.  However, on April 15, 2010, Mother was

---

[2]  Petitioner's Exhibits 1 and 2 are portions of the CHINS record in My.J.'s and Ma.J.'s cases respectively.  Because essentially the same documents were filed in both cases, cited or quoted material often is found in both exhibits, but for the sake of simplicity, we will cite only one exhibit.  The exhibits in this case consist solely of documents, and the pages have been sequentially numbered.  For ease of locating the cited material, we will cite to the page number of the Exhibits Volume rather than the exhibits themselves.

restricted to supervised visits. The reason for this is somewhat unclear because only parts of the CHINS record were included in the termination record, and the testimony at the termination hearing was somewhat inconsistent. The girls' court-appointed special advocate ("CASA"), Gary Herrington, testified that Mother had not been willing to submit information about Hollars for a background check. Herrington also stated that Mother was "getting more agitated," that he "saw issues with cleanliness with the girls," and that he "wasn't pleased with how things were going with service providers." *Id*. at 173. Lowe testified that Mother provided information about Hollars when requested, and the results of the background check did not raise any safety concerns. Lowe testified that her main concern was that she did not want Hollars to be present during visits because Mother should give the girls her undivided attention. Lowe also mentioned a disagreement that she had had with Mother about the extent of her visitation. Mother wanted two overnights per week with the twins, whereas Lowe thought that she should start with one; Lowe felt that this was an indication that Mother was not "concerned about their best interest." *Id.* at 118. At the conclusion of the April 15 hearing, the trial court ordered that Mother's visits be supervised due to unspecified "safety issues." Ex. Vol. at 29. Hoeksema testified that Mother took this ruling hard and began to display a defeated attitude.

On May 4, 2010, Mother began home-based services with Elizabeth Dyson.[3] Dyson also supervised Mother's visits with the twins and C.S. Dyson's goals for Mother were anger

---

[3] Prior to May 2010, Mother had been working with a different home-based counselor, Johnna Holloway. Holloway did not testify, and there is no information in the record concerning her work with Mother.

control, managing stress, and improving organization, specifically, keeping track of appointments. Dyson felt that the first three months of working with Mother went well. Dyson saw improvement in Mother's ability to divide her time between the girls and in her organization. Dyson did not have any concerns about her interaction with the girls.

Father was released from incarceration in the spring of 2010 and remained out for a few months. During this time, Father was permitted to be present for Mother's visits with the girls. Dyson testified that Mother and Father got along during visits. Hoeksema recalled Mother mentioning Father being at her apartment several times, and Mother said that they were "together for the kids and for friendship." *Id*. at 54. Hoeksema testified that she was not aware of any violence between Mother and Father after Father's release from incarceration. At the termination hearing, Mother acknowledged that she had an "intimate" relationship with Father sometime around April 2010. *Id.* at 326. He spent the night at Mother's apartment a few times a week, but did not live there permanently.

On June 28, 2010, Mother was charged with two counts of welfare fraud due to her representation on a food stamps application that there were no other adults living with her, when in fact Father was living with her "on and off." *Id*. at 309.

Around July 2010, Mother began dating Eric Warner. Dyson believed that Warner was living with Mother because she saw some "men's stuff in the bedroom." *Id*. at 14. Just a few weeks after she began dating Warner, Mother told Hoeksema and Dyson that they had been shopping for rings. Hoeksema and Dyson both saw Mother start to regress, and her participation in services became inconsistent.

On August 23, 2010, Mother arrived thirty minutes late for an appointment with Hoeksema. Hoeksema noticed that Mother's eyes were "extremely glassy" and her speech was rapid. *Id*. at 56. Mother said that she had taken a dose of methadone for back pain, which had been prescribed for her. A few days later, Mother was ordered to begin submitting to random drug screens. Mother did not on any occasion test positive for illicit drugs or for drugs that had not been prescribed for her. On September 10, 2010, Mother arrived at another appointment with Hoeksema with an "extremely runny" nose, and Mother's speech was "pretty chaotic from topic to topic, pretty high energy, pretty rapid." *Id*. at 57. Mother said that she had allergies and that she had also taken a dose of morphine to treat injuries that she had sustained in a car accident. Although Hoeksema was concerned that Mother might be abusing drugs, she also readily acknowledged that she was not qualified to testify to whether her symptoms could have been caused by the legitimate use of her prescription drugs.

On September 15, 2010, Mother was charged with receiving stolen property, obstruction of justice, and assisting a criminal. Warner was a co-defendant in that case. Mother remained in jail until December 23, 2010. DCS stopped providing services after Mother was incarcerated. On November 9, 2010, DCS filed a progress report and permanency plan indicating that DCS wished to proceed to termination. On November 18, 2010, the court approved the permanency plan. When Mother was released from incarceration, she contacted Lowe and asked whether she could resume services. DCS declined to offer Mother additional services.

While Mother was incarcerated, it was determined that she was eligible for drug court, and on December 23, 2010, she signed an agreement to enter drug court. Mother admitted that she had been crushing and snorting her prescription drugs, although it is unclear from the record before us when she began doing this. Pursuant to the terms of the agreement, Mother pled guilty to six of the charges against her; the remaining charge will be dropped if she successfully completes drug court. Mother received a five-year sentence that was suspended except for 200 days, which she has already served; if she does not successfully complete drug court, she will serve a seven-year executed sentence. Mother also agreed to testify truthfully against Warner.

DCS filed the petition for termination of parental rights on March 16, 2011. The fact-finding hearing commenced on May 26, 2011, and concluded on August 25, 2011. During this time, Mother made significant progress in the drug court program. Mother is required to submit to random drug screens. Between December 29, 2010, and the conclusion of the termination hearing, Mother had thirty screens, all of which were negative for both prescription and illicit drugs.

On February 14, 2011, Mother got a job. Since then, Mother has been continuously employed, and in May 2011, she was promoted. Mother has been paying child support and will be working with her probation officer to set up a payment schedule to make restitution to the Family and Social Services Administration for the welfare benefits that she illegally received. Mother obtained a referral for a parenting class, which she completed, and she continues to meet one-on-one with a mentor. Mother attends AA and NA meetings each

week and meets with a sponsor approximately every other week.  Mother will also be participating in the Thinking for a Change program.  Mother testified that she would start participating in a women's trauma group in September 2011 and that scheduling conflicts had prevented her from starting sooner.

By the time that the termination hearing concluded, Mother was in phase three (out of four) of her intensive outpatient treatment and phase two (out of four) of the drug court program.  Mother has not had any unexcused absences from treatment, support meetings, or status hearings.  The drug court program lasts eighteen months to three years, depending upon the individual's progress.  Mother's case manager, Abby Runion, and her probation officer, Melissa Stephenson, both testified that Mother was in compliance with the program, that she is "on track" to complete the drug court program, and that Mother appears to be invested in her recovery.  *Id.* at 273.  Since her release from incarceration, Mother's only misstep occurred in March 2011, when she was charged with driving while suspended.  Mother was sanctioned for this offense by the drug court, and she will serve no additional time as long as she successfully completes the program.

Mother is renting a one-bedroom apartment and lives by herself.  DCS has not expressed any concerns regarding the appropriateness of her living arrangements.  Mother has unsupervised parenting time with C.S. every weekend, and no concerns have been raised regarding her ability to parent C.S.  Mother has regularly visited with the twins.  Lowe and Herrington both acknowledged that the twins appear to enjoy spending time with Mother.

Dyson and Hoeksema both testified at the termination hearing, and both acknowledged that they were not aware of Mother's progress since the time that services were discontinued. Hoeksema testified that there was a point in time where she would have been comfortable recommending reunification, but at the time services were discontinued, she had "grave concerns" about reunification. *Id.* at 60.

Lowe testified that Mother had stayed in contact with her, had maintained an appropriate home, did not miss appointments without an appropriate excuse, and has a "very good" relationship with the twins. *Id*. at 159. Lowe testified that she was recommending termination based on the twins' need for permanency and the possibility that Mother would resume using drugs or engage in an abusive relationship. However, Lowe acknowledge that Mother was "doing well" with the drug court program. *Id.* at 155. She did not express concern that Hollars or Warner had been a threat to the twins. Lowe stated that her fear that Mother would resume an abusive relationship was based on the brief period of time that Mother had resumed a relationship with Father in the spring of 2010. However, Lowe acknowledged that there had been no new incidents of domestic violence and she did not expect Mother to avoid contact with Father.

Herrington testified that Mother was "very loving with the children, very good with discipline, and seemed to really care for the girls." *Id*. at 171. However, he stated that he was recommending termination because since March 2010, he had "see[n] nothing but a spiral down." *Id.* at 179. Herrington acknowledged that he had had very little contact with Mother since the petition to terminate had been filed. He stated that after DCS "has moved

to terminate the rights of parents, I no longer concern myself with the parents but concentrate fully on the children." *Id*. at 196.

Phillip Howell, the twins' therapist, also testified at the termination hearing. Howell began working with My.J. in September 2010 and with Ma.J. the following month. Howell testified that the girls initially exhibited some developmental delays. Ma.J. is now on track with children her age, and while My.J. still shows some delays, she has shown improvement. Howell expressed concern that changes in their environment court could halt or interrupt their progress, but he had never worked with Mother and could not testify to her ability to provide the needed support. At the time of the termination hearing, the twins were also attending a special needs day care. Mother and Father both testified that they had begun noticing developmental issues when the girls were only a few months old and had already taken steps to address those issues before DCS's involvement. None of DCS's witnesses expressed any concern that Mother would be unable or unwilling to address the girls' special needs.

Runion and Stephenson each testified to Mother's progress in the drug court program. Although neither one had had the opportunity to see Mother interact with her children, they were not aware of any facts that would make them concerned for her ability to parent them. Stephenson testified that people who are not invested in their recovery typically have multiple rule violations and sanctions or new felony offenses, whereas Mother had been sanctioned only once during the eight months that she had been in the program.

On November 23, 2011, the trial court entered an order terminating Mother and Father's parental relationship with the twins. The trial court concluded that there "is a

11

reasonable probability that the conditions that resulted in [the twins'] removal **and** the reasons for their continued placement outside their parents' care will not be remedied." Appellant's App. at 7. The court indicated that it was giving "great weight" to the testimony of Hoeksema, Herrington, and Howell. *Id.* at 13, 14, 16. The court acknowledged that Mother was "successfully engaging in her Drug Court program" and had "been consistently visiting with the girls." *Id.* at 15. However, the court expressed concern "that Mother has unresolved issues regarding her poor choices in men and choices resulting in her criminal convictions." Mother now appeals.

## Discussion and Decision

When reviewing a trial court's order terminating a parent-child relationship, we will not set it aside unless it is clearly erroneous. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. We will neither reweigh evidence nor judge witness credibility. *In re A.I.*, 825 N.E.2d 798, 805 (Ind. Ct. App. 2005), *trans. denied*. Rather, we will consider only the evidence and reasonable inferences most favorable to the judgment. *Id.*

In *Bester v. Lake County Office of Family & Children*, our supreme court stated:

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. Indeed the parent-child relationship is one of the most valued relationships in our culture. We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

839 N.E.2d 143, 147 (Ind. 2005) (citations, quotation marks, and alteration omitted).  In

recognition of the seriousness with which we address parental termination cases, Indiana has

adopted a clear and convincing evidence standard.  *Castro*, 842 N.E.2d at 377.

To obtain a termination of the parent-child relationship, DCS must establish that

(A) that one (1) of the following is true:

…

(iii) The child has been removed from the parent and has been under
the supervision of a county office of family and children or probation
department for at least fifteen (15) months of the most recent twenty-
two (22) months, beginning with the date the child is removed from the
home as a result of the child being alleged to be a child in need of
services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in
the child's removal or the reasons for placement outside the home of
the parents will not be remedied.

…

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011).

Mother challenges the trial court's finding pursuant to subsection (b)(2)(B)(i).[4] "In determining whether the conditions that led to a child's removal will not be remedied, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing and take into consideration evidence of changed conditions." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010) (citations omitted). While the court should "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child," *id.*, "termination of parental rights cannot be based entirely upon conditions which existed in the past, but which no longer exist." *P.C. v. Dep't of Pub. Welfare of Allen Cnty.*, 630 N.E.2d 1368, 1374 (Ind. Ct. App. 1994), *trans. denied*. "The trial court can properly consider the services that the State offered to the parent and the parent's response to those services." *In re A.B.*, 924 N.E.2d at 670. DCS is not required to rule out all possibilities of change, but only needs to establish that there is a reasonable probability the parent's behavior will not change. *Id.*

The trial court focused on Mother's behavior leading up to her incarceration in

---

[4] DCS argues that our decisions state that the parent-child relationship will be terminated when it is no longer in a child's best interests. *See In re M.S.*, 898 N.E.2d 307, 311 (Ind. Ct. App. 2008) ("[W]hen determining what is in the best interests of the children, the interests of the parents are subordinate to those of the child. Thus, parental rights will be terminated when it is no longer in the child's best interests to maintain the relationship.") (citation omitted); *In re B.D.J.*, 728 N.E.2d 195, 200 (Ind. Ct. App. 2000) ("Because the ultimate purpose of the law is to protect the child, the parent-child relationship will give way when it is no longer in the child's interest to maintain this relationship."); *Castro*, 842 N.E.2d at 372 (same). DCS argues that because Mother has not challenged the trial court's finding that termination is in the children's best interests, she has effectively conceded that the trial court's order was not erroneous, and we "need go no further in [our] analysis." Appellee's Br. at 16. Each of the quoted excerpts come from a paragraph discussing the constitutional nature of the parent's rights; the remainder of the opinions make it abundantly clear that DCS must prove *all* the statutory elements. We admonish DCS to refrain from this sort of selective citing in the future.

September through December 2010.[5]  While this is relevant evidence for the court to

---

[5]  We are also concerned that some of the trial court's findings appear to be unsupported or speculative.  For example:

- In paragraph 10(a), the court states that following the parents' arrest on September 10, 2009, both were charged with battery.  While the record is clear that both parents were arrested, we have not found anything in the record indicating that Mother was in fact charged, or if charged, what the disposition of that charge was.
- In paragraph 10(s), the court stated that Mother had begun, but had not completed a parenting class.  The only witness to testify regarding whether Mother had completed the parenting class was Stephenson, who said that Mother had completed the course and was continuing to meet with a mentor.
- In paragraph 10(u), the court found that Mother had "lied to DCS and other service personnel regarding the status of her relationship with Warner."  Appellant's App. at 11.  Dyson and Hoeksema were the only service providers to testify, and neither indicated that Mother had lied to them about Warner.  Dyson stated that she did not think that mother was "being completely truthful" with Lowe, but it is unclear whether this statement was based on her personal knowledge. Tr. at 14.  For her part, Lowe did not testify that Mother had lied to her about Warner.
- In paragraph 10(v), the court found that Mother admitted to substance abuse to be admitted into the drug court program, but when she "was first ordered to complete Drug and Alcohol services on November 5, 2009, in the CHINS proceeding, she continued to deny substance abuse issues in the CHINS proceeding."  Appellant's App. at 11.  Throughout the termination proceedings and in its appellee's brief, DCS has repeatedly raised the inference that Mother lied about her drug use throughout the CHINS proceedings.  The argument appears to be that because Mother ultimately admitted to abusing prescription drugs, she must have been abusing them all along.  However, DCS presented no evidence of when Mother's drug problem began.  Mother has not had a single failed drug screen throughout the CHINS or termination proceedings.  DCS implies that it had no means for testing whether Mother was abusing her prescription drugs, but the record is silent as to whether such testing is available.  DCS presented testimony from Hoeksema that Mother appeared to be under the influence of drugs on two occasions; however, Hoeksema also firmly testified that she was not qualified to testify as to whether the symptoms could have been side effects from the legitimate use of prescription drugs.  At any rate, both these instances occurred shortly before Mother was incarcerated and admitted to abusing prescription drugs.  DCS even went so far as to suggest that entering a denial to the drug allegations in the CHINS petitions was tantamount to lying.  Declining to admit a fact and requiring the party with the burden of proof to go forward with evidence does not constitute lying.
- In paragraph 10(y), the trial court found that "Hoeksema very firmly testified that she would have 'grave concerns' about reunification of the girls with their Mother *at this point*." *Id.* at 13 (emphasis added).  Hoeksema testified that she had grave concerns *as of the time services were terminated* in September 2010. Hoeksema readily admitted that she did not know what had happened since then and that it was possible for someone "to make meaningful change over the course of several months." Tr. at 71.

15

consider, ultimately, the court was supposed to determine Mother's fitness *at the time of the termination hearing*. *Id.* at 670.

By the time the termination hearing concluded in August 2011, Mother had undisputedly made significant progress in each area of concern. Mother was in compliance with the rigorous terms of the drug court program. She was progressing in treatment, attending two weekly support meetings, and meeting regularly with a sponsor. She had

- In paragraph 10(ff), the court stated that it gave "great weight" to the CASA's testimony the he felt that Mother would not be able to provide a safe and stable home for "two to three years down the road." Appellant's App. at 14. However, we note that Herrington acknowledged that he had not been keeping himself apprised of Mother's progress since the time that DCS filed the petition for termination because he had already made up his mind that termination was in the twins' best interest. When he was asked why he believed that Mother's negative behaviors would continue, he stated, "I have been informed by DCS and by [the foster parents] that there have been some situations of anger and resentment." Tr. at 198. We are not prepared to say that having hard feelings toward DCS or the foster parents, without more, is evidence that Mother is not a fit parent.
- In paragraph 12, the trial court found that Mother "continues to minimize her own responsibility for the continued placement of the girls outside her care." Appellant's App. at 15. This finding appears to be an extension of the findings that Mother had lied about her drug use and relationships. It appears also to be based on Hoeksema's testimony that Mother tended to have a "victim mentality," i.e., that she tended to blame others and view herself as a victim of circumstances. Tr. at 56-57. As discussed above, Hoeksema has not met with Mother since before her incarceration; thus, Hoeksema's statement is not evidence that Mother has an ongoing problem with accepting responsibility for her actions.
- Finally, in paragraph 13, the trial court found that "Mother's recent efforts seem to be motivated by the threat of long-term incarceration" and criticized her for not being primarily motivated by reunification with her children. Appellant's App. at 15. This finding strikes us as speculative, but even if supported by the record, we cannot say that the desire to avoid incarceration is a *bad* motive.

In sum, the trial court stated that it gave great weight to the testimony of Hoeksema, Herrington, and Howell. However, it is clear from the record that Hoeksema's and Herrington's testimony did not take into account Mother's efforts in the eight months since her release from incarceration. Howell has never met with Mother, and no one has expressed any concern that Mother would be unwilling or unable to do what is needed to support the twins' development.

Mother has also expressed concern regarding the trial court's finding that there "is a reasonable probability that the conditions that resulted in [the twins'] removal **and** the reasons for their continued placement outside their parents' care will not be remedied." *Id*. at 7. Mother correctly notes that this finding does not track the language of Indiana Code Section 31-35-2-4(b)(2)(B)(i), which does not include the word "continued." Mother argues that the trial court read this provision too expansively and should have considered only the original reasons for the children's removal. DCS cites several cases, which it argues support the more expansive reading of the statute. *E.g.*, *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 266 n.3 (Ind. Ct. App. 2004), *trans. denied*. We conclude that DCS did not meet its burden under either interpretation of the statute.

16

provided thirty random drug screens, all of which were negative for illicit and prescription drugs. If she successfully completes drug court, Mother will not serve any additional time.

Furthermore, there has been no indication that Mother has been in *any* relationship, let alone an abusive one, since her release. Nor were there any additional incidents of violence since the twins' original removal in September 2009. Mother recognized problems in her relationship with Hollars and ended it, which Hoeksema considered a positive sign. That Mother agreed to testify against Warner also tends to show that she recognized that that relationship had become unhealthy as well.

In addition to these positive changes, Mother had an appropriate home, was holding down a job, and was regularly visiting with the twins. No one disputed that Mother and the twins had a positive, loving relationship. Mother has visitation with C.S. every weekend, and no concerns have been raised regarding her ability to parent C.S. and provide her with a safe environment. The twins were making progress in their development through therapy and a special needs preschool, and there was no indication that Mother would be unwilling to do what was necessary to continue supporting their special needs. In fact, there was evidence that Mother had recognized developmental delays even before DCS's involvement and had been taking steps to address them.

In the eight months leading up to the termination hearing, Mother's only misstep was the new charge of driving while suspended in March 2011. However, Mother was sanctioned through the drug court and will face no additional consequences as long as she completes the program. When a parent has been involved with drugs or an abusive relationship, there will

17

always be concern about relapse. However, this is not a case where the parent's progress has been inconsistent or last-minute. We do not feel that it is necessary to speculate about Mother's potential for relapse. There are no longer any immediate concerns about her ability to parent the twins, and her ability to cope with the added responsibility can be quickly assessed without substantial risk of harm to the twins. *See H.G. v. Ind. Dep't of Child Services*, 959 N.E.2d 272, 291-92 (Ind. Ct. App. 2011) (reversing termination of incarcerated mother's parental rights where she had been involved in her children's cases, had a bond with the children, had maintained contact with the children, attempted to have the children placed with relatives, had taken advantage of self-improvement opportunities while incarcerated, was soon to be released, and her ability to parent could be quickly assessed after her release), *trans. denied (2012)*. We acknowledge that this will cause some disruption in the twins' lives; however, by all accounts, they have a loving relationship with their Mother, and termination could also be a source of disruption in their lives. "It is well established that the involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed." *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011). We conclude that DCS failed to meet its statutory burden of proving that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; therefore we reverse.

Reversed.

RILEY, J., and BAILEY, J., concur.