Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 22 2014, 10:00 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN T. WILSON**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE TERMINATION OF THE )
PARENT-CHILD RELATIONSHIP OF )
Jac.B., Je.B., Jam.B., M.H., and A.B. )
(Minor Children) and )
)
B.B. (Mother), )
)
    Appellant-Respondent, )
)
        vs. )    No. 33A01-1401-JT-40
)
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE HENRY CIRCUIT COURT
The Honorable Mary G. Willis, Judge
Cause Nos. 33C01-1307-JT-14, -15, -16, -17, and -18

**August 22, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

B.B. ("Mother") appeals the trial court's termination of her parental rights to her five children: Jac.B., Je.B., Jam.B., M.H., and A.B. We affirm.

**Facts and Procedural History**

In its termination order regarding Jac.B., Je.B., and Jam.B., issued December 26, 2013, the trial court made the following relevant findings and conclusions:[1]

<u>FINDINGS OF FACT</u>

….

A.    <u>FACTS RELATING TO INITIAL REMOVAL OF CHILD, CHINS ADJUDICATION & DISPOSITIONAL ORDER</u>

….

2.    On May 2, 2003 the child, Jac.B., was born; on October 3, 2004 the child, Je.B., was born; on January 25, 2006 the child, Jam.B., was born (known collectively hereinafter as "the children").

3.    R.B. is the father of the Children.

4.    Mother is the mother of the Children.

5.    On or about March 9, 2007, the Children and the parents R.B. (hereinafter "Father") and Mother became involved with DCS [the Department of Child Services] when DCS assessed a report that the children were being neglected by their parents. More specifically, the facts are that the parents engaged in an act of domestic violence and were homeless.

6.    On or about March 9, 2007 Father and Mother entered into a voluntary program of informal adjustment approved by the Court on March 14, 2007. The Father received anger management training and the Father

---

[1] The trial court's order refers to the parties by their full names. We use "Mother" and initials where appropriate.

2

and Mother were to follow recommendations regarding parenting. The informal adjustment closed by court order[] on September 6, 2007.

7. On or about November 21, 2008 Father and Mother became involved with DCS for a second time when DCS assessed a report that the children witnessed an incident of domestic violence between Mother and her live in boyfriend that required Mother to receive medical attention. Father's whereabouts were unknown and he was believed to be homeless. The children were detained. The home was cluttered and did not appear to have sufficient bedding for the children.

8. On December 1, 2008, the children were adjudicated Children in Need of Services. A Dispositional decree was entered on December 23, 2008 and Mother participated in individual counseling services until case closure on May 21, 2009. Father was never located.

9. On or about January 26, 2010 Father and Mother became involved with DCS for a third time when DCS assessed a report that the children's younger sibling, M.H., born January 26, 2010 to Mother and her current husband, P.H.,[2] was born drug positive for the presence of marijuana. Mother tested positive for the presence of marijuana at the time she gave birth to M.H. Mother entered into an informal adjustment approved by the Court on February 25, 2010. The informal adjustment closed on August 25, 2010, following completion of services by Mother.

10. On or about December 9, 2011, Father and Mother became involved with DCS for a fourth time when DCS assessed a report that the family was homeless and Mother tested positive for MDPV (bath salts). Father's whereabouts were unknown. Mother entered into an informal adjustment program approved by the Court on December 21, 2011 wherein she agreed to participate in a parenting assessment and recommended services as well as a substance abuse assessment and recommended services.

11. The children and M.H. were detained on or about January 30, 2012 following Mother's failure to engage in agreed upon services and Mother's failure to maintain housing for the children. A Child in Need of Services petition was filed on February 1, 2012 and the children

_____

[2] P.H. executed a consent to M.H.'s adoption and was dismissed as a party to the termination proceeding.

were adjudicated children in need of services on February 3, 2012 following Mother's admission that she was homeless and unable to provide basic needs for the children. Father failed to appear and default judgment [was] made against him. The informal adjustment discharged unsuccessfully after the children were detained.

12. On February 24, 2012 [a] dispositional order was entered. Mother was directed to participate in parenting assessment and recommended services, substance abuse assessment and recommended services, random drug screens, and psychological evaluation and recommended services and to maintain stable and suitable housing and source of income. Father failed to appear.

….

14. On November 9, 2012, Mother gave birth to a fifth child, A.B. Paternity of the child was not established at birth. The child was detained on or about November 13, 2012. A Child in Need of Services petition was filed on November 14, 2012 and the child was adjudicated a child in need of services on December 7, 2012 following Mother's admission that at the time of the child's birth she had unstable housing and her mental health condition impaired her ability to adequately care for the infant. Mother further admitted that her remaining four children remained placed outside of her care.

15. On January 4, 2013, a dispositional order was issued as to the child A.B. Mother was directed to participate in home based counseling, home based case work, a psychological evaluation and recommended services, a parenting assessment and recommended services, and to abstain from the use of drugs, obtain stable and suitable housing and obtain a legal source of income.

B. **FACTS RELATING TO CHILD'S CONTINUED REMOVAL FROM PARENT'S HOME AND CARE; REASONABLE PROBABILITY OF PARENT NOT REMEDYING REASONS FOR REMOVAL, THREAT TO CHILD'S WELLBEING, CHILD'S BEST INTEREST, & DCS PLAN FOR CARE AND TREATMENT**

1. After formal removal of children per the Dispositional Decree of February 24, 2012, the children were never returned to parents' care and custody.

[Findings 2 through 5 relate to Father's lack of contact with children, failure to pay child support, felony criminal convictions, incarceration, and failure to maintain contact with DCS.]

6. Mother's participation in home based case management and individual counseling services was inconsistent and complicated by mood instability. Mother's housing situation improved but did not remain stable during the review period as she relocated five times. Mother's housing at the time of fact finding belonged to a third party who paid all the expenses and was dependent upon this relationship continuing.

7. On July 26, 2013, the Court in the underlying Child in Need of Services case issued an order that reunification efforts cease and authorized the filing of the petition for termination of parent child relationship.

8. No service provider was ever able to recommend that Father or Mother … be reunified with their Children. Val Saylor, Mother's therapist, indicated Mother may have been able to provide care for her youngest child alone provided that Mother continued to receive services and supervision by DCS.

9. Tim Davis provided intensive home based case management services including supervised visitation, parenting skills education, employment and housing assistance to Mother. He provided services three to four hours per week from January, 2013 to July, 2013. During that time, Mother lived at four different addresses. Mother reported to him that she was diagnosed with bipolar disorder and agoraphobia. He observed during visits that Mother was comfortable with her daughters but less comfortable with her sons. Although Mother was cooperative and eager to learn she was unsuccessful in obtaining employment or establishing stable housing.

10. Heather Smith provided home based case management services including supervised visitation, parenting skills education, housing and employment assistance to Mother two times per week from February, 2012 to July, 2013.… Mother always attended her supervised visits but had "a hard time" keeping her individual appointments with Ms. Smith. Mother failed to engage with the children during visits. Ms. Smith observed that initially Mother's sons sought physical affection from Mother but this subsided and the children rarely acknowledged Mother at later visits. Mother demonstrated a caring attitude toward the children but was overwhelmed by parenting responsibilities for her five

children. Mother exhibited a high stress level during visitation. Mother failed to complete five different appointments arranged by Ms. Smith to begin the process of applying for disability. Ms. Smith believed that at the time of fact finding Mother was still unable to resume caretaking responsibilities for the children due to her lack of stable housing, lack of income, and mental health concerns.

11. Val Saylor provided individual therapy for Mother from January 2012 to June 2013. Mother was diagnosed by Mr. Saylor with cannabis dependence, opiate abuse, generalized anxiety and borderline personality disorder. He described Mother's attendance as "up and down." His monthly attendance summary reflected a significant number of missed appointments. Mr. Saylor observed an improvement in Mother's mental health based upon her ability to self-soothe during periods of anxiety.

12. Mother acknowledged that she has been provided services by DCS in the underlying Child in Need of Services case, and four prior cases. Mother stated that she has benefitted from the services of providers Val Saylor, Tim Davis and Heather Smith. She believes she is more stable emotionally, mentally and physically. Mother stated she has no current income but has a pending disability application submitted based upon her mental health diagnoses and some physical concerns. Mother admitted to living at seven different locations in the most recent two years. At the time of fact finding she was living in a three bedroom home of a third party along with three other adults. Mother loves her children.

13. Amber Nussbaum, therapist, provided individual and family therapy to the children from June 2012, to the time of fact finding. (November 22, 2013) She stated that at the time she engaged with them initially, the boys exhibited irritability, low tolerance for frustration, agitation and struggled to get along with others including their siblings and authority figures. She believed that the boys have shown progress in therapy and that, while the children still struggle, they are able to stop and process their thoughts and react more appropriately. Ms. Nussbaum emphasized the importance of permanency for the boys by stating that in order to be healthy, the boys need to know where home is, have consistency in that home, know who will address their needs, know where they will lay their head down at night and know who will be at their home each day. Stability is key to the children's mental health. Ms. Nussbaum stated that when she and FCM Hagans advised the

children that reunification efforts had been ceased, the children had little reaction.

14. Family Case Manager Michael Hagans (hereinafter "FCM Hagans") was assigned case management responsibilities from November, 2012 to October, 2013. During that time, neither Mother nor Father gained unsupervised visitation or trial home visit[s] with the children.… FCM Hagans believed that Mother's mental health status continued to be of concern and impaired Mother's ability to fulfill parental obligations.

15. Based on Mother and Father's lack of progress, and their refusal or inability to improve their ability to provide proper care and nurturing for the children, DCS Family Case Manager Janelle Miles testified that adoption and termination of parental rights was in children's best interests. The CASA [court-appointed special advocate] echoed that adoption and termination of parent[al] rights was in children's best interests.

….

## CONCLUSIONS

1. Children have been removed from the home and custody of Father and Mother and have been under the supervision of DCS for at least fifteen (15) of the most recent twenty-two (22) months, and ha[ve] been removed from their Father and Mother for more than six (6) months pursuant to the terms of the dispositional decree.

2. There is a reasonable probability that:

   a. The conditions which resulted in Children's removal and continued placement outside the home will not be remedied by Father and Mother;

   b. That continuation of the parent-child relationship poses a threat to Children's wellbeing.

3. Termination of parental rights is in Children's best interests.

4. There is a satisfactory plan for the care and treatment of Children, that being adoption.

7

Appellant's App. at 119-27 (footnote and citations to exhibits omitted).

The trial court also issued termination orders containing substantially similar findings and conclusions as to M.H. and A.B. Pursuant to the orders, the trial court terminated the parental rights of Mother, R.B., and A.B.'s father, S.M.[3] Only Mother has appealed.

**Discussion and Decision**

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Matter of M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. "The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). "The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all of a parent's rights to his or her children. Termination of parental rights is therefore intended as a last resort, available only when all other reasonable efforts have failed." *B.H. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 355, 365 (Ind. Ct. App. 2013) (citations and quotation marks omitted).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

---

[3] In its termination order regarding A.B., the trial court noted that S.M. had been incarcerated since her birth, with an anticipated release date of September 2014.

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. As a standard of proof, clear and convincing evidence requires the existence of a fact to "'be highly probable.'" *In re D.W.*, 969 N.E.2d 89, 94 (Ind. Ct. App. 2012) (quoting *Hardy v. Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009)). "It need not reveal that 'the continued custody of the parent[] is

wholly inadequate for the children's very survival.'" *Id*. (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind.1992)). "Rather, it is sufficient to show that the children's emotional and physical development are threatened by the parent's custody." *Id*. "The [trial] court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. "Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013).

Mother claims that some of the trial court's findings "are not supported by the record and misleading," Appellant's Br. at 7, but she does not specifically challenge the accuracy of

any of the numerous findings or contend that they are insufficient to support the judgment in their totality. Instead, Mother emphasizes portions of the findings that are favorable to her and essentially invites us to reweigh the evidence. This we cannot do.

Mother also argues that DCS failed to carry its burden of proving "by clear and convincing evidence that the conditions resulting in the removal of the child[ren] would not be remedied; or that continuation of the parent-child relationship poses a threat to the well being of the children; or that termination was in the best interest of the children." *Id.* We note, however, that Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive and thus requires that only one of the three requirements under subparagraph (B) be proven true by clear and convincing evidence. *B.H.*, 989 N.E.2d at 364. Therefore, we need not address Mother's argument regarding whether continuation of the parent-child relationship poses a threat to the children's well-being.

This Court has said,

> When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination.

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted). "DCS is not required to rule out all possibilities of change, but only needs to establish that there is a reasonable probability the parent's behavior will not change." *In re Ma.J.*, 972 N.E.2d 394, 402 (Ind. Ct. App. 2012).

It may be true, as Mother observes, that she participated in some services and made some progress in addressing her substance abuse and mental health issues. But, as DCS points out, she was involved with the agency five separate times starting in 2007 and has lived in at least seven different locations since 2011.[4] She never obtained employment or stable and suitable housing, missed five visits to apply for disability, and participated in services inconsistently. Moreover, Mother felt overwhelmed with the children during visits. Despite encouragement, she would fail to engage with them, especially her sons, who became detached from her over time. Based on Mother's chronic instability, inconsistent participation in services, and inability to cope with her children in a supervised setting, we cannot say that the trial court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied.

As for the trial court's conclusion that termination is in the children's best interests, Mother complains that "[n]one of the case managers or service providers testified that it is in the best interest of the children that [her] rights be terminated." Appellant's Br. at 8. DCS

---

[4] Mother states that she "was living in a stable home in New Castle and had lived there for approximately seven to eight months." Appellant's Br. at 9. At the hearing, she testified that she had lived there for about eight months "off and on" and had "been there straight like actually stay there stay there for about five (5) months." Tr. at 53. Mother lives in a three-bedroom home rent-free with two men, one of whom has a criminal history.

points out that this was a result of Mother successfully objecting to such testimony being given. By the same token, as the trial court noted, none of the case managers or service providers recommended that Mother be reunited with the children. In its termination orders, the trial court found that FCM Miles and the CASA opined that termination was in the children's best interests; those findings were based on exhibits submitted by DCS, not on testimony from the termination hearing. To the extent that Mother makes any additional argument on this issue, it is merely an invitation to reweigh evidence, which we must decline.

Finally, Mother complains that DCS's "plan for eventual adoption is nothing more than a statement to [this] effect, and there is no guarantee that that will take place or that the children will even remain together." *Id*. at 10. We have stated,

> In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.

*In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008) (citation omitted). "The fact that there is not a specific family in place to adopt the children does not make the plan unsatisfactory." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*. Here, DCS's plan is for the children to be adopted, which is satisfactory. Therefore, we affirm the trial court's termination order.

Affirmed.

RILEY, J., and MATHIAS, J., concur.