## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 19 2018, 9:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew W. Foster
Rockport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationships of:

H.H., A.H., and A.S. (Minor Children)

and

M.R.,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

September 19, 2018

Court of Appeals Case No. 18A-JT-790

Appeal from the Spencer Circuit Court

The Honorable Jon Dartt, Judge

The Honorable Lucy Goffinet, Special Judge

Trial Court Cause No. 74C01-1708-JT-185, 74C01-1708-JT-186, 74C01-1708-JT-187

**Altice, Judge.**

## Case Summary

M.C.R. (Mother) appeals following the termination of her parental rights to her three children, H.H., A.H., and A.S. (collectively, the Children). Mother argues that the evidence was insufficient to support the termination of her rights.

We affirm.

## Facts & Procedural History

In September 2015, Mother and the Children, then ages seven, eight, and nine, lived with Mother's boyfriend of several years. Mother and her boyfriend had a history of domestic violence and drug use. The mobile home in which they lived was dirty, unsafe, and unsuitable for the Children. The Indiana Department of Child Services (DCS) became involved with the family on September 8, 2015, and the Children were removed from the home a week later when Mother tested positive for methamphetamine and other illegal substances and the conditions of the home had not been adequately remedied. After the Children's removal, Mother tested positive for illegal drugs in September and October 2015.

[4] The Children were adjudicated CHINS on April 19, 2016,[1] and a dispositional order was issued following a hearing on May 9, 2016. Mother became generally compliant with services and things were going well. Mother passed drug screens, participated in family therapy and home-based services, visited with the Children, and became employed. Mother and her boyfriend also cleaned up the trailer and took domestic violence classes. As a result, the Children were returned to Mother for a trial home visit in September 2016. During the trial home visit, however, Mother lost her job and her relationship with her boyfriend ended. This resulted in her "downhill spiral" and return to drug use. *Transcript* at 54.

[5] On or about December 16, 2016, a therapy provider, Olivia Golike, went to Mother's trailer upon discovering that H.H. was not at school for a therapy session. Golike found all three children home alone inside the trailer and not at school. They had not eaten breakfast and had not seen Mother. Golike contacted the family case manager (FCM), Channell Hood, who also came to the home. When Mother returned home that morning, she submitted to a drug screen. The Children were removed immediately from Mother's home and returned to foster care. Mother's drug test came back positive for methamphetamine.

---

[1] The fact-finding hearing on the CHINS petition took place on November 23, 2015. The reason for the significant delay in issuing the order finding the Children to be CHINS is unclear from the limited record before us.

[6]     After the failed trial home visit, Mother continued using drugs and was homeless by March 2017. She stopped showing up for visits with the Children around March 2017 and has not seen them since. Mother's sporadic participation in services during early 2017 eventually ceased, and she had no contact with service providers in May and June. All services for Mother were officially put on hold in June due to Mother's noncompliance. FCM Hood finally located Mother in July 2017 and attempted to reengage Mother in services. Thereafter, Mother participated irregularly in services and was placed on twenty-four-hour call-ahead due to problems with her not showing up. Mother continued using illegal drugs and failing to obtain mental health and/or substance abuse treatment as recommended by DCS.

[7]     In August 2017, the permanency plan in the CHINS case was changed to concurrent plans of reunification and adoption. In the August 17, 2017 order approving the permanency plan, the CHINS court found in part:

> [Mother has] not complied with the [Children's] case plan. [Mother] stopped participating in parent aide and therapy sessions. She participated in 4 drug screens and was positive on 4/04/2017 which was the last hearing date. [She] has not participated in any support groups or treatment programs. She was not responding to any requests to come into the DCS office to submit [to] drug screens or otherwise. [Mother] is currently homeless.

*Appellee's Appendix* at 66. DCS filed verified petitions for involuntary termination of parental rights on August 21, 2017.

[8] A periodic case review hearing was held in the CHINS case on November 13, 2017. In the order from this review hearing, the court found that Mother was still not compliant with the case plan, explaining:

> Mother is to be screened at the DCS office 2-3x per week. At the last court hearing, she tested positive for amphetamine, methamphetamine, and THC…. She was negative on screens in September, however, in October, she missed several screens. Home based therapy was reinstated in August to address goals of relapse prevention, coping skills, dealing with her depression and trauma as well as relationship with the children and ex-boyfriend. She missed the first scheduled appointment and admitted to using methamphetamine during that time slot. Mother scheduled an evaluation with an in-patient treatment provider, however, she cancelled due to reporting that someone stole her money for the evaluation. Mother has reported that she participates in AA/NA but has never provided documentation. She has never consistently attending [sic] her therapy sessions. Mother is employed, but she does not have stable transportation at this time.

*Id*. at 75-76. Immediately after this hearing, Mother informed FCM Hood that she was going into a rehabilitation facility that day. She did not go, nor did she contact FCM Hood, continue with therapy, or comply with drug screens. Again, Mother maintained no contact with service providers. Further, a drug screen taken at this hearing tested positive for THC.

[9] On December 11, 2017, Mother entered a thirty-day inpatient treatment program. Thereafter, she moved into a shelter and began intensive outpatient treatment. The treatment was not arranged through DCS, and Mother did not reach out to FCM Hood until the week before the termination hearing.

[10] The termination fact-finding hearing took place on January 22, 2018. At the hearing, Mother acknowledged her long battle with drugs and that she had not seen the Children since early 2017. Mother indicated that during much of 2017 she was using drugs, homeless, unstable, and even suicidal. Mother testified that her most-recent rehabilitation effort, which she started the month prior to the termination hearing, was her sixth time in rehab. When asked why this time will be different, Mother responded: "I was doing everything okay and then because of losing everything, I fell apart but this time I'm determined. I don't want to lose my kids." *Id*. at 17. Regarding substance abuse, Mother stated that she was participating in a twelve-step program now, with a sponsor and a support group. She acknowledged, however, that in the past she had been involved in a twelve-step program and then quit and relapsed. At the time of the hearing, Mother was unemployed, living in a shelter, without a vehicle, and less than two months clean and sober.

[11] The CASA, Carol Lichtey, testified that the Children had not spoken about Mother to her since April 2017. In Lichtey's opinion, termination is in the best interests of the Children after a history of ups and downs with Mother and, particularly, the instability of the prior two years. She testified that each move "takes a little bit more of them away." *Id*. at 47. Lichtey noted that H.H., the oldest of the Children, was becoming cynical and recently stated, "I don't get attached – people come and people go." *Id*. at 48.

[12] Among other things, FCM Hood testified in detail about Mother's lack of cooperation with services and lengthy absences after the failed trial home visit in late 2016. Regarding the Children's best interests, FCM Hood testified:

> I believe they need to know where they're going to be and I think if they're with mom, they're never going to know where they're going to be from day to day. That's just been the pattern that I've seen from the kids – talking to the kids about their past. You know, that's the life they have lived and they don't – their [sic] done with that.

*Id.* at 63. FCM testified that the permanency plan for the Children following termination was adoption.

[13] At the conclusion of the hearing on January 22, 2018, the court terminated Mother's parental rights. The court entered a written termination order on February 26, 2018, which provided in relevant part:

> There is a reasonable probability that the conditions that resulted in the [Children's] removal or the reasons for the placement outside the parent's home will not be remedied in that: The case has been open for two years. The mother still has no stable housing. The mother has only one month of doing well in rehabilitation. During the CHINS case, mother failed to do drug evaluations and rehabilitation. The mother has not visited the children in a year. The children have been subjected to domestic violence. The mother had CPS history in other state[s]. The mother does not have a consistent plan of action. The mother has been inconsistent with children and the children's history shows inconsistency. The children need stability and want stability. The mother has continued to test positive for illegal substances throughout the life of the CHINS case.

*Appellant's Appendix* at 8. Upon finding that termination was in the best interests of the Children, the court stated to Mother at the hearing: "I am glad and I am proud that for the last month you have held it together and that you have completed the in-patient treatment but your kids deserve a permanent home and they want that". *Transcript* at 71.

[14] Mother appeals the termination of her parental rights. Additional information will be provided below as needed.

## Discussion & Decision

[15] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[16] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App.

2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[17] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). The trial court here determined that DCS had proven both subsections (b)(2)(B)(i) and (b)(2)(B)(ii). Because DCS was required to establish only one of these by clear and convincing evidence, we focus our review on the requirements of subsection (b)(2)(B)(i).

[18] In determining whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside the home will not

be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Further, it is within the trial court's discretion to disregard efforts made only shortly before termination and to weigh more heavily a parent's history of conduct prior to those efforts. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1234 (Ind. 2013). The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[19] On appeal, Mother does not challenge the trial court's specific findings of fact. She argues only that the trial court clearly erred when it determined that there was a reasonable probability that the conditions that resulted in the Children's removal or the reasons for the placement outside the parent's home will not be remedied. In this regard, Mother argues that she was actively involved in drug rehabilitation at the time of the termination hearing and in 2016 had nearly completed a successful trial home visit with the Children. Noting her progress

during the first half of the CHINS proceedings and her recent progress after a significant period of relapse, Mother asserts that she has been "either compliant or actively helping herself for approximately sixteen (16) of twenty-eight (28) months, or 57% of the total life of the CHINS case." *Appellant's Brief* at 8.

[20]   Like the trial court, we applaud Mother for her recent efforts at rehabilitation and wish the best for her. But forty-two days of treatment at the eleventh hour is not enough considering the entire history of this case and Mother's past repeated failed attempts at maintaining a drug-free life. Mother's progress during the first year of the CHINS proceeding is well-documented, and she was doing what was needed to regain custody of the Children. When life got difficult during the trial home visit in December 2016, however, Mother's life quickly fell apart again, and she returned to using methamphetamine. Over the next year, Mother continued using drugs and was not compliant with services. For significant periods of time, service providers could not even find her. She stopped attending visits with the Children, became homeless, and failed to commence drug and mental health treatment as recommended by DCS. Not until December 2017 did Mother seek treatment in an inpatient program. This was a year after the failed trial home visit, at least nine months after she had last seen the Children, and more than two years after the CHINS proceedings commenced. At the time of the termination hearing, Mother was living in a shelter, was jobless, had been clean for only about forty-two days, and had not seen the Children for nearly a year.

In sum, the record establishes that Mother was not fit to care for the Children at the time of the termination hearing.[2] Moreover, her long history of drug abuse and repeated relapses after treatment, as well as her inconsistent participation in DCS services, indicate a substantial probability of future neglect or deprivation of the Children. The Children have been in the system for well over two years and need, want, and deserve to have permanency in their lives, which Mother has been unable to provide for them. The trial court did not err in determining that there was a reasonable probability that the conditions that resulted in the Children's removal or the reasons for the placement outside Mother's home will not be remedied.

Judgment affirmed.

Brown, J. and Tavitas, J., concur.

---

[2] Mother directs us to *In re Ma.J.*, 972 N.E.2d 394 (Ind. Ct. App. 2012) in support of her argument for reversal of the termination order. In *Ma.J.*, we expressly noted, "this is not a case where the parent's progress has been inconsistent or last-minute." *Id*. at 404. Rather, the mother in that case had "eight months of solid progress in each area of concern". *Id*. at 396. Further, at the time of the termination hearing, she had an appropriate home, had been working, and had been visiting regularly with the children. In the case at hand, Mother was not similarly situated at the time of the hearing and had not established the same degree of progress.