## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 20 2016, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT-FATHER

Jane Ann Noblitt
Columbus, Indiana

ATTORNEYS FOR APPELLANT-MOTHER

R. Patrick Magrath
Laura Raiman
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In The Termination Of The Parent-Child Relationship Of:  D.W. & L.B., (Minor Children),

and

C.W. (Mother) & A.W. (Father),

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

April 20, 2016

Court of Appeals Case No.
03A01-1508-JT-1165

Appeal from the Bartholomew Circuit Court

The Honorable Stephen R. Heimann, Judge

The Honorable Heather M. Mollo, Magistrate

Trial Court Cause Nos.
03C01-1409-JT-4218
03C01-1409-JT-4220

**Brown, Judge.**

[1] In this consolidated appeal, C.W. ("Mother") appeals the involuntary termination of her parental rights with respect to her children, D.W. and L.B., (the "Children"), and A.W. ("Father") appeals the involuntary termination of his parental rights with respect to his child, D.W. The issue is whether the evidence is sufficient to support the termination of their respective parental rights. We affirm.

## Facts and Procedural History

[2] Mother is the biological mother of, S.B., born February 11, 2003, L.B., born October 11, 2009, and D.W., born December 16, 2010. Father is the biological father of D.W.[1] On September 25, 2012, the Indiana Department of Child Services ("DCS") received a report regarding marijuana use and drug paraphernalia in the home where S.B., L.B., and D.W. were residing. Mother told DCS that Father had been recently incarcerated on charges of dealing marijuana and that she was on probation, and an individual providing care for the children also admitted to using marijuana while watching them.

[3] As a result of the report, on October 1, 2012, Mother agreed to an informal adjustment.[2] On October 4, 2012, the results of a drug screen showed that Mother tested positive for THC, amphetamine and methamphetamine, and

---

[1] The biological father of S.B. and L.B. signed a consent to the adoption of L.B., did not appear at the termination hearing, and is not appealing the termination of his parental rights.

[2] An informal adjustment is a negotiated agreement between a family and a local DCS office in which the family agrees to participate in various services in an effort to prevent the child or children from being formally deemed a child or children in need of services. *See* Ind. Code §§ 31-34-8.

DCS removed the children from the home. The next day DCS filed a petition alleging S.B., L.B., and D.W. were children in need of services ("CHINS") on the basis of Mother's drug use and the drug use history of Mother and Father. On November 2 and 6, 2012, DCS learned of allegations of domestic violence between Mother and Father.

[4] Based upon the admissions of Mother and Father, on December 20, 2012, the court adjudicated S.B., L.B., and D.W. to be CHINS,[3] held a dispositional hearing that same day, and ordered Mother and Father to participate in home-based care management, comply with all probation terms and services, submit to random drug and alcohol screens, attend all scheduled visitations with the Children, and comply with all rules and procedures. Separately, Mother was ordered to successfully complete a twelve-step recovery program and obtain a recovery coach, participate in individual therapy, complete an assessment for Moving On, and follow all recommendations. Father was ordered to participate in a substance abuse assessment, follow all recommendations, and participate in the SAFE program, a domestic violence services program, as a part of his probation.

[5] On October 29, 2012, Father underwent a substance abuse evaluation at Centerstone. DCS referred Mother to drug treatment services at Centerstone, including an intensive outpatient program ("IOP") and group and individual

---

[3] S.B., who is Mother's eldest child, had his CHINS case dismissed in July 2013 when his paternal grandmother obtained guardianship over him, and is not a subject of this appeal.

therapy to help her with depression and anxiety. Mother was initially compliant but had a relapse with marijuana and methamphetamine in January 2013, prior to completing the IOP, and was referred for follow-up treatment at Tara Treatment Center. In March 2013, Father was unsuccessfully discharged from his drug treatment program because he failed to document his AA and NA meetings correctly, threatened service providers at Centerstone, and was thought to have been responsible for graffiti in the restroom near the facility.

[6] At review hearings on March 19 and 26, 2013, the court found that Mother had partially complied with services and that Father was not in full compliance with D.W.'s case plan and had not enhanced his ability as a parent. On March 25, 2013, Father was convicted of possession of marijuana as a class D felony, a charge he had reported to DCS in October 2012. In April 2013, he began but did not complete another drug treatment program. He also participated in aftercare but did not obtain a sponsor for his recovery and was not forthright with the service providers on this issue.

[7] On June 23, 2013, DCS received a report of a domestic violence incident involving Mother and Father, which resulted in the parties' brief separation, and Father, who has suffered from bipolar disorder since he was eighteen years old, checked himself into the Columbus Regional Stress Center due to suicidal ideations. He was given a mood stabilizer and medication to help manage his depression, a seizure disorder, and high blood pressure, and he began the SAFE program for a second time. The next month, Mother completed the IOP program, maintaining consistent attendance throughout. On September 12,

2013, the court conducted a permanency hearing and found that Mother and Father were partially compliant with the Children's case plans and ordered concurrent plans of reunification and guardianship. Mother completed an aftercare program in October 2013, and throughout her participation in both the IOP and aftercare she produced twelve negative drug screens.

[8] The following month, DCS recommended that Father undergo a parenting assessment and a psychological evaluation to assess his mental health and level of risk for violence. He completed the SAFE program but on November 16, 2013, came to Mother's place of employment and, following a verbal argument, slammed her head into a filing cabinet causing a periorbital contusion. He was arrested, later pled guilty to interfering with reporting a crime, and Mother filed for a protective order, which was granted.

[9] At a status hearing on December 17, 2013, the court found that Mother was partially compliant and Father was noncompliant with the Children's case plans. On February 19, 2014, Mother tested positive for methamphetamine and amphetamine. On March 4, 2014, the court held a review hearing, found that both parents were noncompliant, and ended DCS's provision of services due to indications from Mother and Father that they were supportive of guardianship as the permanency plan for the Children. Two days later, Mother filed a request for dismissal of the protective order against Father, and it was dismissed on March 10, 2014. In May 2014, Mother and Father expressed their desire to seek reunification rather than guardianship as a permanency plan. The next

month, Father was arrested for his involvement in an altercation with his father and was in Brown County Jail until his release in August 2014.

[10] On September 16, 2014, DCS filed a petition for termination of parental rights, and the court held a termination hearing on January 9, 2015. Testimony was given by Danielle Fawbush, an assessment worker for DCS, Zach Shelton, a family case manager, from December 20, 2012 through April 2013, Beth Gruenewald, Joy Stagg, and Ashley Pulskamp, addictions therapists at Centerstone, Keith Simpson, a Bartholomew County community corrections officer assigned to Father, Lee Hamlin, a clinical therapist at Family Service, Jessica Jester, a family case manager ("FCM Jester"), Craig Lubbe, a substance use counselor at Adult and Child, Kelly Richards, Mother's recovery coach, Betsy Schuette, the Children's court appointed special advocate ("CASA Schuette"), Father, and Mother.

[11] On July 22, 2015, the court issued separate orders terminating the parental rights of Mother and Father. Both orders made detailed findings of fact and concluded that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied, that continuation of the parent-child relationship poses a threat to the Children's well-being, that termination of the parental rights of Mother and Father was in the Children's best interests, and that adoption is a satisfactory plan for the Children.

## Discussion

The issue is whether the evidence is sufficient to support the termination of the respective parental rights of Mother and Father. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[13] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592

N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

"Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

### *Remedy of Conditions*

We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable

probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[16] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[17] In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does

not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[18] The trial court's termination orders addressed the participation of both Mother and Father in therapy and services. Specifically, the court entered substantially similar separate orders with respect to D.W. and L.B. and in the order related to D.W. contained findings consistent with the foregoing and further found:

> 4. In March 2013, Mother dropped the Protective Order against Father.

> 5. In March 2013, Mother was also recommended for in-patient treatment for her substance abuse.

6. Mother successfully completed inpatient substance treatment at Tara Treatment Center at the beginning of May 2013 with discharge recommendations for outpatient substance treatment along with meeting with a recovery coach.

* * * * *

12. Father received a second referral for substance abuse evaluation with Adult and Child. He was recommended for IOP; during the evaluation interview, Father reported an extensive history of marijuana use starting at age eleven and reported periods of time in which he was also dealing drugs.

13. Father was unable to successfully complete IOP with Adult and Child due to concerns again that Father was not invested in finding recommended community sobriety supports . . . . Adult and Child had no contact with Father after November 2013. He was unsuccessfully discharged in February 2014.

14. The addictions clinician had ongoing concerns for Father at discharge. The chances of Father staying clean and sober are diminished without a sober support system. Although completion of a re-lapse prevention program may have benefit, it is time limited in nature and cannot replace the long-term nature of sober supports.

15. DCS also believed the community sober supports were important for Father. He was asked to invite a sober support to a child and family team meeting. He failed to do so.

16. Father testified at trial that he will soon complete a re-lapse prevention class. He also reports attending weekly meetings. He has not documented these activities for DCS.

17. Through much of the underlying CHINS case, there continued to be concerns of domestic discord between Mother and Father. Information was disclosed to family case manager Jessica Jester of further incidents of domestic violence.

18. From the outset of the assessment of the CHINS case, Mother could acknowledge that there was some concern with Father's interaction with the children in the home. In addition to [D.W.], there were two older siblings in the home, who were also adjudicated as Children In Need of Services simultaneously with [D.W.]. Mother witnessed controlling behaviors by Father in his care and supervision of the children, especially the oldest, [S.B.]. Father was belittling at times and threatening in his remarks to the children.

19. [S.B.] clearly recalls the destruction of property during conflict between the parents. He witnessed Mother being physically injured by Father. He also disclosed that he was physically injured by Father. It was an acknowledged fact by the treatment team at Centerstone that [S.B.] had been duct taped to a chair by Father.

20. In one of the initial meetings between Mother and Centerstone, Mother relayed another earlier incident where she had been confined by Father in a bathroom and he had taken her cell phone.

21. By the time Mother was released from Tara in May 2013, she was again in a relationship with Father.

22. Services were identified to address the domestic violence concerns. Upon her release from Tara, Mother was referred to Moving On, a women's cognitive behavioral program designed to help women make safe decision[s] for themselves and develop healthy coping strategies. Mother was also expected to attend

individual counseling coordinated with the same agency conducting the Moving On program. Mother was unsuccessfully discharged from both due to poor attendance.

23. By a June 2013 Status Hearing, Father had volunteered to participate in the SAFE program, a domestic battery prevention program, through Bartholomew County Probation. By the June hearing, the Court had been presented with evidence of significant trauma to [S.B.]. In particular, through [S.B.'s] CHINS case there was evidence that [S.B.] had suffered emotional and physical abuse while in the care of Mother and Father. The trauma had been so significant that by June 2013, [S.B.] was in a guardianship with a third party and there were protective orders in place prohibiting Father from having contact with [S.B.]. The past abuse to [S.B.] was relevant to the safety of [D.W.]. The Court expected the team to assess whether Father had made the necessary changes to some of his core attitudes and beliefs such that he would not be a threat to the well-being of [D.W.]

\* \* \* \* \*

27. Following the November 16, 2013 domestic violence incident, Mother memorialized in writing four years of domestic violence perpetrated by Father on her and her son [S.B.].

28. A review of Mother's account shows a clear pattern of Mother leaving Father but returning to an unsafe situation based upon the repeated promises of change by Father. The account portrays physical and emotional abuse, escalating in severity, along with Father isolating and controlling Mother's conduct.

\* \* \* \* \*

30. On February 19, 2014, Father pled guilty to a Class A Misdemeanor Interfering with Reporting a Crime, events related to November 16, 2013, under Cause Number 03D02-1311-CM-6171 in which he was sentenced to one year in Bartholomew County jail all suspended, consecutive to his sentence in Cause Number 03D02-1210-FD-5248. Father was ordered to comply with the No Contact Order in place for Mother, as well as the Protective Order.

31. On February 19, 2014, Father admitted to violating his probation under Cause Number 03D02-1210-FD-5248, when he was arrested following the domestic violence altercation. The Court ordered Father to be in a Community Correction placement for the balance of his probation term.

32. Following the November 2013 incident, Mother reengaged in services but began to struggle with attendance at services in late December 2013 and by February 2014 was inconsistent with visitation. In February, she acknowledged to the family case manager that she could not complete her treatment goals in a timely manner and was in support of a guardianship for the child. On February 26, 2014 Mother provided a positive drug screen for methamphetamine and amphetamine.

\* \* \* \* \*

34. Mother and Father resumed their relationship in May 2014 and remain together at the time of this termination trial.

\* \* \* \* \*

36. On August 4, 2014, Father admitted to violating his probation under Cause Number 03D02-1210-FD-5248 and

03D02-1311-CM-6171, when he was arrested following a domestic altercation in June 2014.

37. The parents report participating in services on their own, but have not engaged in services through DCS referrals since March 2014.

38. Father continues to minimize domestic violence with Mother. Father never acknowledged his role in the abuse of [S.B.].

39. Mother does not demonstrate the insight or the strength to keep herself or her children safe.

40. Mother participated in visitation with varying consistency. She struggled to participate in visitation at times when a relapse would occur.

41. In February 2014, Mother had moved to some unsupervised visitation until she had a positive drug screen for methamphetamine and amphetamine.

42. Father participated in visitation sporadically but spent varying time incarcerated for substance use or domestic violence related incidents.

43. The current DCS Family Case Manager assigned to this case, Jessica Jester, believes that adoption and termination of parental rights is in the best interests of [D.W.]. She has ongoing concerns that the continuing relationship between Mother and Father is a significant risk factor for [D.W.'s] safety due to the history of domestic violence.

44. Betsy Schuette, the Court Appointed Special Advocate for [D.W.], agreed that termination of parental rights is in [D.W.'s] best interest. The domestic violence perpetrated by Father against Mother and Mother's history of allowing her children to be exposed to the same cause the CASA to support termination of parental rights. The CASA also filed a written report with the Court, which is made a part hereof by reference, and which expresses the same sentiment as her testimony.

45. DCS has not supported reunification since March 4, 2014.

46. DCS's plan for [D.W.] is that he be adopted. At time of termination, [D.W.] was in a pre-adoptive home with family; the plan of adoption is satisfactory for [D.W.'s] care and treatment.

Appellant-Mother's Appendix at 12-17; Appellant-Father's Appendix at 8-13.

[19] Mother argues that the removal of the Children was based on her drug use and concerns related to domestic violence, and she notes that she successfully completed an intensive outpatient program as well as aftercare and produced twelve negative drug screens. She also points out that she followed up on NA/AA meetings on her own after services were discontinued and that the record does not support that she has failed to remedy her substance abuse issues or that the Children are endangered by her substance abuse. Mother notes that she self-reported the June 2013 and November 2013 incidents of domestic violence and that there "was never a reported concern" that L.B. or D.W. "had ever been directly physically endangered by domestic violence" and that DCS's concern was that the Children would witness domestic violence in the home. Appellant-Mother's Brief at 13. Mother also points out that she and Father

reunited in May 2014, have been living in the home of Father's father, which is "safe, stable, and drug free," that she has begun participating, on her own initiative and along with Father, in couples counseling, and that her relationship with Father has stabilized with the last incident of domestic violence occurring on November 16, 2013. *Id.* (quoting Transcript at 110).

[20] Father asserts that DCS failed to present clear and convincing evidence that conditions had not been remedied or that he posed a threat to D.W., and he contends that the court failed to take into account evidence of current conditions, relying instead on his history of parental shortcomings as a basis for termination. He argues that despite fourteen drug screens during his interaction with DCS he tested positive only twice, with the last positive screen occurring in January 2013, that at the time of the hearing he was participating in relapse prevention services, that the last incident of domestic violence involving he and Mother occurred in November 2013, and that he and Mother were participating in couples counseling. He also pointed out that at the time of the hearing he was paying child support, engaging in regular visitation, and, had a place to live and care for D.W., while acknowledging that the home's suitability was not addressed by DCS. He points out that the court's sole finding related to current conditions states "[t]he parents report participating in services on their own, but have not engaged in services through DCS referrals since March 2014," and that the court based termination on Father's history rather than in light of current conditions. Appellant-Father's Brief at 11 (citing Appellant-Father's Appendix at 12).

[21] DCS maintains that the termination of the parental rights of Mother and Father was supported by clear and convincing evidence, and it points out that neither Mother nor Father specifically challenges the court's factual findings, and their arguments amount to a request to reweigh the evidence. DCS notes that Mother did not fully participate in or complete all the services recommended to her, stayed in an abusive relationship after multiple incidents of domestic violence involving Father, had inconsistent attendance at visitation with the Children, and a lack of stable housing and employment. It further notes, as to Father, that he had not completed drug treatment or a recommended psychological evaluation. Shortly after Father completed a domestic violence class, he abused Mother and minimized his role in the couple's instances of domestic violence. DCS contends that Father lacked stable housing and employment and was inconsistent in his visitation. DCS also points out that the trial court made findings as to evidence of Father's current conditions.

[22] To the extent Mother and Father do not challenge any of the juvenile court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when the father failed to challenge specific findings, the court accepted them as true).

[23] The Children were removed from the care of Mother and Father due to Mother's drug use and the drug use history of Mother and Father. Shortly after

removal, DCS became aware of reports of domestic violence perpetrated by Father against Mother. Regarding both substance abuse and domestic violence, the court found that neither Mother nor Father completed all of the recommended services, including substance abuse treatment and therapy, and that the instances of domestic violence by Father against Mother were not remedied even after Father completed a domestic violence program and was on mood stabilizing medication. Over the course of the CHINS case, visitation with the Children was inconsistent, and, in Father's case, interrupted by periods of incarceration for substance use and domestic violence. Additionally, the court found that at the time of the termination hearing Father continued to downplay his role in the couple's domestic violence and that, even after the provision of services, Mother lacked the insight to protect herself or the Children from Father's violent outbursts against her. At the time of the hearing, Father had not obtained employment but was receiving disability and testified that he was pursuing employment with Toyota through a placement service, while Mother was employed at a local flea market stand Father's father operated, making approximately $50 per day. Mother and Father were residing at the home of Father's father, which DCS had not assessed for suitability at the time of the termination hearing because FCM Jester noted that she did not know "how stable it is, just because I don't know very much about the dynamics of the relationship between [Father] and his dad either." Transcript at 110. As to Mother's completion of the goals of her case plan, FCM Jester stated that "there are significant pieces of the case plan goals that were not completed," including "not being able to complete Moving On or the individual

counseling. . . ." *Id.* at 98. FCM Jester acknowledged that Father completed a substance use evaluation while she had the case, but participated in services at Adult and Child inconsistently, had a relapse with alcohol, failed to obtain an NA/AA sponsor and later lied about having obtained one, and she stated that she did not "think that [she] could say that the domestic violence issue, or concern has been remedied." *Id.* at 112. The court also found that neither Mother nor Father provided documentation of the services they represented they were participating in at the time of the termination hearing.

[24] To the extent Mother and Father assert that the court failed to take current or changed conditions into account, we note that it found that, at the time of the termination hearing, Father continued to minimize his role in domestic violence against Mother and her eldest child, S.B., and that while Mother and Father stated they were participating in services they had not documented their participation. Moreover, the court noted that Mother appeared to be unable to "demonstrate the insight or the strength to keep herself or her children safe." Appellant-Mother's Appendix at 16. Consequently, we cannot say that the court failed to consider the efforts made by Mother and Father to remedy conditions at the time of the termination hearing, or balance evidence of changed conditions with their habitual patterns of conduct. *See In re E.M.*, 4 N.E.3d at 643 (noting that it is within the trial court's discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination).

[25] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied.[4]

### Best Interests

[26] We next consider Father's assertion that DCS did not present clear and convincing evidence that termination was in D.W.'s best interest.[5] Father argues that his visitation with D.W. was going well, that there was no evidence he had ever been physically violent or ever threatened D.W. or that D.W. witnessed any domestic violence, and that there were no findings as to Father's relationship with D.W., the effect on D.W. when Father's visits are terminated,

---

[4] To the extent Mother and Father cite to *In re Ma.J.*, 972 N.E.2d 394 (Ind. Ct. App. 2012), and *In re C.M.*, 960 N.E.2d 169 (Ind. Ct. App. 2011), *aff'd on reh'g*, 963 N.E.2d 528 (Ind. Ct. App. 2012), we find those cases distinguishable. Unlike the mother in *In re Ma.J.*, who made progress in areas of concern, neither Mother nor Father had completed their recommended services at the time of the termination hearing, including therapy, substance use counseling, regular attendance at scheduled visitation, domestic violence services, and maintaining stable and consistent housing and employment. Also, the court here, unlike the court in *In re C.M.*, made findings related to current conditions, which showed that Father had not completed the goals of his case plan and that he was participating in services at the time of the hearing but had not yet acknowledged and tended to minimize his role in domestic violence against Mother.

[5] Mother asserts that "[a]doption was not a necessary permanency goal for the children . . . ." Appellant-Mother's Brief at 14. To the extent she argues that DCS failed to present a satisfactory plan at the termination hearing, we note that she does not develop an argument that adoption was not a satisfactory plan of care or treatment. We cannot say that DCS failed to present a satisfactory plan for care and treatment of the Children. *See In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (noting that for a plan to be "satisfactory" for the purposes of the termination, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated") (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

how D.W. is faring in his current placement, and the reason his current placement is in his best interests.

[27] We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*.

[28] At the termination hearing, FCM Jester testified that termination was in D.W.'s best interest because he was doing well in his adoptive home, and there continued to be domestic violence concerns in that shortly after Father completed the SAFE program he committed an act of domestic violence against Mother. Also, CASA Schuette, when asked whether it was in D.W.'s best

interest to be returned to Mother and Father, testified that she believed "termination is in the best interest for the children. Where they are now, they have been, they have the stability, they're thriving." Transcript at 154-155. CASA Schuette observed both Children's behavior and interaction and testified:

> When I first met [the Children], they seemed to be pretty behind in their development, and behavioral issues. There was a lot of very concerning behavioral issues. The [Children] were quite violent, violent in a way that it was, they thought it just playing and normal. One of them, I believe it was [L.B.], that had a look like, that was funny. [The Children] did bite each other quite a bit, then. And then another visit, he had climbed in my lap and did a choking, like he didn't actually hurt me, but he was, like choking me, and in a way where, looking me square on in the eyes and it, that was okay. That was very concerning for me.

*Id.* at 152. CASA Schuette also stated in her report that Father's lack of commitment to and completion of services, lack of contact with the service providers and DCS workers, multiple incarcerations, domestic violence, and pattern of instability due to the parties' domestic disputes provide further support that termination is in D.W.'s best interest. Based on this testimony, as well as the totality of the evidence in the record and set forth in the court's termination orders, including Father's failure to complete all recommended services, his failure to accept responsibility for acts of domestic violence against Mother, and his inability to acknowledge his role in the abuse of Mother's eldest child, S.B, we conclude that the court's determination that termination was in D.W.'s best interest is supported by clear and convincing evidence. *See In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that

"[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), *reh'g denied*.

## *Conclusion*

[29] We conclude that the trial court's judgment terminating the parental rights of Mother and Father is supported by clear and convincing evidence. We find no error and affirm.

[30] Affirmed.

Kirsch, J., and Mathias, J., concur.